Argued and submitted on September 14, 2022, reversed and remanded
March 8, 2023

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# MATTHEW ANTONIO CAGE,
*Defendant-Appellant.*

## Coos County Circuit Court
16CR31619; A175268

526 P3d 785

Defendant challenges his convictions for menacing, ORS 163.190; unlawful use of a weapon, ORS 166.220; and felon in possession of a firearm, ORS 166.270. He assigns error to the trial court's denial of his motion to suppress evidence derived from a stop that he asserts was unlawful. Defendant argues, among other things, that the 9-1-1 call that formed the basis for the officer's reasonable suspicion was not sufficiently reliable. The state contends that the officer had reasonable suspicion to stop defendant based on the 9-1-1 report and the officer's observations at the scene. The state also argues that, even absent reasonable suspicion, the officer could have lawfully stopped defendant as a material witness under *State v. Fair*, 353 Or 588, 302 P3d 417 (2013). *Held*: The trial court erred. The 9-1-1 report was not sufficiently reliable because the report was made secondhand, and the officer did not sufficiently corroborate the report. In addition, the material-witness exception did not provide a constitutional basis for the stop because the officers did not have an objectively reasonable basis to believe defendant was a material witness to a crime.

Reversed and remanded.

Martin E. Stone, Judge.

David O. Ferry, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Egan, Judge, and Kamins, Judge.

EGAN, J.

Reversed and remanded.

**EGAN, J.**

In this criminal case, defendant appeals his convictions of menacing, ORS 163.190 (Count 1); unlawful use of a weapon with a firearm (UUW), ORS 166.220, ORS 161.610 (Count 2); and felon in possession of a firearm (FIP), ORS 166.270 (Count 3). Defendant assigns error to the trial court's denial of his motion to suppress evidence derived from a stop that he asserts was unlawful.[1] The trial court denied defendant's motion to suppress, concluding that reasonable suspicion to stop defendant existed based on a 9-1-1 report, and that, even absent reasonable suspicion, officers could have lawfully stopped defendant as a material witness under *State v. Fair*, 353 Or 588, 302 P3d 417 (2013). We conclude that the trial court erred: Officers did not have reasonable suspicion to stop defendant and, on the facts of this case, could not lawfully stop defendant as a material witness. Therefore, the trial court erred by denying defendant's motion to suppress. We reverse and remand.

We review a trial court's denial of a motion to suppress for legal error, and we are "bound by the trial court's factual findings if there is any constitutionally sufficient evidence in the record to support" them. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017) (citing *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993)). Consistent with that standard, we state the following facts from the record of the suppression hearing.

At around 1:00 a.m. on May 26, 2016, an employee at the Motel 6 in Coos Bay called 9-1-1 and reported a dispute near the vending machine area of the motel where "one subject involved had a firearm." A motel guest had observed the dispute and reported it to the employee, who then called 9-1-1. Within five minutes of receiving that report, three officers—Krebs, Volin, and Merritt—arrived at the motel.

---

[1] In a supplemental *pro se* brief, defendant advances six additional assignments of error. Our disposition obviates the need to address all of them except his argument that the court erred in failing to acquit him of some unspecified offense. We reject that argument because it was not preserved in the trial court and does not involve "plain error." *See State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990) (an error is apparent on the face of the record if the legal point is obvious and not reasonably in dispute, and if the reviewing court need not look beyond the record or choose from competing inferences to find the error).

They walked into the parking lot and looked inside the vending machine room, where they found no people or signs of a dispute. Merritt turned and noticed a vehicle parked in front of the building where the vending machines were located. He saw defendant in the driver's seat and a female passenger, H, in the front passenger seat of the car. Merritt saw other vehicles parked in front of the building and throughout the parking lot, but he did not see any other people in the area. Merritt testified that, when H noticed him and the other officers, she immediately began kissing defendant. Merritt walked to the passenger side door and knocked on the car window, but neither H nor defendant acknowledged him.

Once Merritt was able to get H's attention, he asked H to step out of the car. As she stepped out of the car, Merritt noticed that she had mascara "running down her face," and he "noted that she had been crying." Merritt did not observe any injuries on H, and when questioned about her crying, she told Merritt that her grandfather had recently died. Upon additional questioning, H told Merritt that she did not know anything about a dispute or a gun.

When H initially got out of the car, Merritt had observed defendant in the driver's seat "with his hands wrapped around a sweatshirt or something like that." While Merritt was questioning H, he noticed that Krebs had his back turned to the car and that defendant "was focused on Officer Krebs." Due to concerns that defendant had a weapon, Merritt told Krebs to "get [defendant] out of the vehicle." Before exiting the car, defendant placed the "sweatshirt" onto the passenger seat. At the time of defendant's stop, Volin was not with the other officers, because he had gone to the second floor of the motel to look for the witness.

After defendant exited the vehicle, Krebs asked him for identification, which defendant provided. Dispatch informed Krebs that defendant had a warrant for his arrest, and Krebs took him into custody. After defendant was placed in custody, Volin returned from the second floor of the motel and told Merritt that he saw a gun in the passenger seat of defendant's car. Merritt found a handgun on the passenger seat and removed it from the car.

Following this encounter, defendant was charged with menacing, UUW, FIP, obliteration or change of identification number on a firearm, and pointing a firearm at another. Before trial, defendant moved to suppress all evidence derived from the stop. Defendant argued that the officers stopped him without reasonable suspicion that he had committed a crime, violating his rights under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution.

At the suppression hearing, Merritt, the sole witness, testified about the circumstances that led him to believe that he had reasonable suspicion to stop defendant. The trial court found his testimony to be credible. Merritt testified that his notes from the report that he received said that "the RP front desk far building, the vending machines are in dispute in the parking lot. Guest says one subject involved had a firearm." During his testimony, Merritt did not specify what crime he believed defendant committed, but he testified that he had "reasonable suspicion that [defendant and H] were involved in the dispute that [the officers] were called to." When the prosecutor asked Merritt whether he believed defendant "had knowledge of what happened," Merritt testified, "[w]ell, of course. I believed he was involved." Merritt also testified that officers had identified the guest who reported the dispute to the Motel 6 employee after defendant was stopped. Officers did not know the guest's identity at the time they stopped defendant, thus that information is not applicable to our reasonable suspicion analysis, but the guest was named throughout Merritt's testimony at the suppression hearing.

The trial court denied defendant's motion to suppress. The trial court concluded that Krebs stopped defendant when he asked defendant to step out of his car.[2] The trial court determined that the officers had reasonable suspicion to stop defendant, because (1) Merritt testified that he suspected that defendant "had engaged in some form of criminal activity," and (2) that belief was reasonable, "given all the circumstances," which included the "report [from a motel employee] of a dispute and brandishing a firearm that

---

[2] On appeal, the parties do not dispute that conclusion.

occurred close to the vending machine location at Motel 6."
The trial court found that the officers had received the call
early in the morning, arrived quickly to the area, and found
two people in a car parked near the vending machines.
Additionally, Merritt did not see any other people in the
area, had observed that H had been crying, believed that H
and defendant were "evasive in their answers," and noticed
that defendant had something hidden in his hands.

The trial court concluded that the 9-1-1 report was
sufficiently reliable to support reasonable suspicion, because
it came "from a motel employee, who passe[d] on something
from an identified individual," and the officers "can certainly
corroborate that [report] by contacting the employee of the
motel that day." The trial court determined that Merritt cor-
roborated the report based on his testimony about what he
had observed at the scene. Furthermore, the trial court held
that the officers had authority to stop defendant as a mate-
rial witness under *Fair*, 353 Or 588. The court concluded
that it was "reasonable for the officers to believe that these
individuals had some information that would be critical
to their investigation" based on the officers' belief that an
offense had been committed involving a firearm and defen-
dant's location next to the vending machine area.

Accordingly, the trial court denied the suppression
motion. Ultimately, a jury convicted defendant of menacing,
UUW, and FIP.

Defendant appeals the denial of his motion to sup-
press, arguing that the officers lacked reasonable suspicion
to seize him. First, defendant argues that the 9-1-1 report
was insufficient—on its own—to support reasonable suspi-
cion that defendant committed a crime, because it lacks suf-
ficient "indicia of reliability." Second, defendant argues that,
even if the 9-1-1 report was sufficiently reliable, the evidence
did not provide specific and articulable reasons to support a
reasonable suspicion that defendant committed any crime.
The state argues that, based on the totality of the circum-
stances, officers had reasonable suspicion that defendant
engaged in UUW and menacing, so defendant was lawfully
stopped. In the alternative, the state argues that the officers
had authority to stop defendant as a material witness.

The critical question in this case is whether officers had reasonable suspicion to stop defendant. An officer has authority to stop a person if the officer "reasonably suspect[s]—based on specific and articulable facts—that the person committed a specific crime or type of crime or was about to commit a specific crime or type of crime." *Maciel-Figueroa*, 361 Or at 182. For a stop to be constitutional under Article I, section 9,

> "the court (1) must find that the officers actually suspected that the stopped person had committed a specific crime or type of crime, or was about to commit a specific crime or type of crime, and (2) must conclude, based on the record, that the officers' subjective belief—their suspicion—was objectively reasonable under the totality of the circumstances existing at the time of the stop."

*Id*. That rule has both subjective and objective components, such that the officer must subjectively believe that the person committed a specific crime, and "the basis for that belief—the specific facts, articulated by the officer, that led him or her to believe that the defendant may have committed a crime," must also be objectively reasonable based on the totality of the circumstances. *Id*. at 182-83.

"It is the state's burden to establish that an officer had reasonable suspicion to initiate a stop." *State v. Rodriguez*, 320 Or App 1, 8, 511 P3d 424 (2022) (citing *State v. Westcott*, 282 Or App 614, 618, 385 P3d 1268, *rev den*, 361 Or 486 (2017)). "Evidence acquired after a stop cannot be used to establish or negate reasonable suspicion *for* the stop." *State v. Ellis*, 252 Or App 382, 389, 287 P3d 1215 (2012) (emphasis in original).

A citizen's report may establish reasonable suspicion that criminal activity occurred, but the report must contain some "indicia of reliability" if an officer's reasonable suspicion is based solely on the report. *State v. Villegas-Varela*, 132 Or App 112, 115, 887 P2d 809 (1994). Three factors help determine the reliability of an informant's report. *Id*. The factors "are merely intended to serve as an aid in evaluating the reliability of such a report" and are not determinative as to the report's reliability. *State v. Mitchele*, 240 Or App

86, 92-93, 251 P3d 760 (2010) (citing *State v. Killion*, 229 Or App, 347, 356, 211 P3d 367, *rev den*, 347 Or 349 (2009)).

The first factor is "whether the informant is exposed to possible criminal and civil prosecution if the report is false," which is satisfied when informants provide their name to law enforcement or provide the information in person. *Villegas-Varela*, 132 Or App at 115. The second factor is "whether the report is based on the personal observations of the informant." *Id*. Officers may infer that the report is based on personal observations if the information in the report "contains sufficient detail" to show that it was not "fabricated," and "the report is of the sort which in common experience may be recognized as having been obtained in a reliable way." *Id*. (internal citation and quotation marks omitted). The last factor is "whether the officer's own observations corroborated the informant's information." *Id*. That factor is satisfied if the officer "observe[s] the illegal activity" or "find[s] the person, the vehicle, and the location substantially [as] described by the informant." *Id*.

Here, as it relates to the first factor, "whether the informant is exposed to possible criminal and civil prosecution if the report is false," *Villegas-Varela*, 132 Or App at 115, Merritt testified that he believed the caller was a Motel 6 employee, but the caller did not provide a name and was not identified before the stop. Defendant argues that the first factor is not satisfied, because Merritt did not know the reporting party's identity before the stop, and the record did not identify the reporter's specific job or relationship to the motel. In response, the state argues that the reporting party was exposed to liability, because the reporter was readily identifiable as a Motel 6 employee and the police arrived within five minutes of the call. The state also argues that the informant was not required to provide a name in order to meet the first factor. *See State v. Shumway*, 124 Or App 131, 135, 861 P2d 384 (1993) (determining that the first factor was met, even though the informant did not provide his name to law enforcement, because "there [was] no indication that he was unwilling to do that," and the informant spoke to the officer in person).

Our analysis of the first factor is informed by *State v. Hunt*, 265 Or App 231, 335 P3d 288 (2014). There, the defendant argued that an informant's report was insufficiently reliable to support reasonable suspicion when a motel's front desk clerk reported to the police three separate calls from other guests regarding activity in a specific room at the motel. *Id.* at 232-33. The defendant argued that the first factor was not met, because the motel employee acted "merely as a conduit" for the guests' complaints. *Id.* at 236. We rejected that argument, concluding that the first factor was satisfied, because the employee identified himself to the dispatcher and identified himself to officers when they arrived at the motel to investigate. *Id.*

In this case, we conclude that the first factor is neutral. Unlike in *Hunt*, where the informant identified himself and talked to officers in person upon arrival, the informant here did not provide his or her name to law enforcement when making the report, did not greet the officers upon arrival, and the officers did not identify the reporting party before stopping defendant. *See id.*; *see also State v. Simpson*, 245 Or App 152, 157, 261 P3d 90 (2011) (holding that, when an informant did not identify herself or make the report in person, and the officer stopped the defendant before knowing whether the informant remained at the scene, the first factor was not satisfied). Merritt testified that he believed the report came from a motel employee, but he did not know the person's identity before stopping defendant. However, the police arrived right away, and it was reasonable for Merritt to assume that the employee was readily identifiable, thus supporting reliability. Even assuming, as the state contends, that the first factor is met, under the circumstances, it does not weigh heavily in our analysis.

As to the second factor, "whether the report is based on the personal observations of the informant," *Villegas-Varela*, 132 Or App at 115, defendant argues that it was not satisfied, because the motel employee reported the information secondhand from a motel guest. We understand the state to rely on *Hunt* to argue that that factor was met, asserting that a motel employee's secondhand report—received from a guest—can be sufficiently reliable even if the employee did not observe the reported activity.

In *Hunt*, a motel employee reported secondhand information to police that the employee had received from several guests at the motel. 265 Or App at 232-33. We concluded that the second factor was not satisfied "in the strictest sense" but that, in light of the circumstances, it did "not undermine the reliability of the report." *Id.* at 237 (internal citation and quotation marks omitted). We reasoned that the amount of detail included in the report demonstrated that the report was likely not fabricated. *Id* at 238. Additionally, we noted that the relationship between a guest and front desk clerk "suggests that the front desk clerk would believe the guests' complaint and that the information had been reliably obtained." *Id.*

In *Hunt*, the officers had a description of the parties, a description of the car involved, and multiple reports about the parties' conduct such that the report was sufficiently reliable even though it was made secondhand. *Id.* In this case, the officers only knew that a dispute involving a firearm occurred near the vending machines of the motel. Unlike in *Hunt*, in this case, the motel employee made a report secondhand from information that the employee had received from one guest, the employee did not personally verify the report, and the report did not contain any significant detail. The details in this case are not "sufficient to show that neither the front desk clerk nor the guests had likely fabricated the report." *Id.* Thus, the second factor was not satisfied here.

Lastly, we turn to the third factor—"whether the officer's own observations corroborated the informant's information." *Villegas-Varela*, 132 Or App at 115. According to Merritt's testimony, the information to be corroborated from the 9-1-1 report was "the RP front desk far building, the vending machines are in dispute in the parking lot. Guest says one subject involved had a firearm."

Defendant argues that the report did not provide enough details for the responding officers to corroborate, and that Merritt's actual observations did not corroborate the report, because Merritt did not witness or verify any dispute near the vending machines or any dispute that involved a firearm. Specifically, defendant argues that defendant

and H's location in a vehicle nearby did not corroborate any detail that the caller reported. Furthermore, defendant argues that H's crying did not corroborate a dispute involving a firearm, because H explained the reason that she was crying, and she had no signs of injury. The state responds that Merritt's observations corroborated the report, because officers arrived within five minutes of the 9-1-1 call, defendant and H were the only people parked near the vending machine area at 1:00 a.m., H was initially evasive when she noticed the police, Merritt observed that H had been crying, and defendant did not show his hands.

As we previously noted, an officer can corroborate an anonymous tip by "observing the illegal activity or by finding the person, the vehicle, and the location substantially as described by the informant." *Villegas-Varela*, 132 Or App at 115. In *State v. Hames*, we held that an officer did not have reasonable suspicion to stop the defendant because the officer did not sufficiently corroborate an informant's report. 223 Or App 624, 635, 196 P3d 88 (2008). In that case, a named informant reported that four or five people were tearing up a car in a park. The report identified that the parties arrived at the park in a black Honda Civic and a white Chevrolet Corsica or Lumina. *Id*. at 626. The officer arrived at the scene within minutes of receiving the report, he got out of his patrol car and walked towards the reported location, and he saw two cars next to each other in the parking lot with people inside: one white Chevrolet Lumina and one gold-colored car. *Id*. The officer did not observe any of the people "tearing up a car," but he stopped the cars because one of them matched the description from the informant's report, "and he suspected that they had been involved in a crime." *Id*. We held that the officer's observations were insufficient to corroborate the report and create reasonable suspicion, "[b]ecause the scene that [the officer] observed on his arrival to the park was not 'substantially as described by the informant.'" *Id*. at 634-35. The fact that the reported car was at the reported location was not enough to corroborate the report. *Id*. Without more evidence corroborating the report—such as evidence of a vandalized or damaged car—a reasonable officer under the same circumstances would not have "concluded that defendant was engaging,

or had engaged in, the reported criminal activity." *Id.* at 635.

In this case, Merritt did not sufficiently corroborate the 9-1-1 report, because he did not observe any dispute or evidence of a dispute near the vending machines—he only observed people sitting in a car near the vending machines. The state argues that Merritt corroborated the informant's report by finding defendant and H in defendant's car near the reported location of the dispute shortly after receiving the dispatch. But the report made no mention of a vehicle, and a vehicle is inherently mobile, such that defendant and H could have arrived before, during, or after the report. The officers had no information before making the stop as to how long the car had been parked at that location. As in *Hames*, discussed above, defendant's presence in his car near the reported dispute is not sufficient to corroborate that he was the person involved in the dispute or to corroborate that he had participated in any illegal activity. *Id.* at 634-35.

The state also cites H's behaviors at the scene as corroborating the informant's report of a dispute: first, that she was evasive upon seeing Merritt and ignored Merritt's attempts to speak to her; second, that she had been crying. Even if we assume that H and defendant behaved evasively, "[w]e have frequently observed *** that a person's nervous or potentially furtive acts add little to the reasonable suspicion calculus." *State v. Brown*, 318 Or App 713, 722, 508 P3d 45 (2022) (citing *State v. Dawson*, 282 Or App 335, 342, 386 P3d 165 (2016)); *State v. Espinoza-Barragan*, 253 Or App 743, 750-51, 293 P3d 1072 (2012) ("[A] person's legal efforts to avoid being stopped or questioned by the police *** contribute[s] little, if anything, toward a reasonable suspicion of criminal activity."). Thus, the fact that H may have been trying to avoid contact with police officers does not corroborate that defendant was engaged in criminal activity. As for H's crying, we agree with defendant that that evidence is simply insufficient to corroborate the 9-1-1 report and provide reasonable suspicion that defendant had committed a crime.

Lastly, the state argues that defendant "hiding something in a sweatshirt" corroborates the report of a firearm.

But defendant's concealment of something does not corroborate a dispute involving a firearm when the officers never asked to see what he was concealing. Although an officer is not required to corroborate all of the facts provided in an informant's report in order to satisfy the third factor, *Hunt*, 265 Or App at 239, Merritt's observations at the scene before stopping defendant did not corroborate the informant's report of a dispute involving a firearm. Merritt did not find "the person, the vehicle, and the location *substantially as described* by the informant" when the informant had made no mention of the parties involved in the dispute or of a vehicle, the officers did not observe any parties in a dispute, and the officers did not observe a firearm. *Villegas-Varela*, 132 Or App at 115 (emphasis added).

We conclude that, because the informant made the report secondhand and Merritt did not corroborate the report, the informant's tip was not sufficiently reliable to support reasonable suspicion. Therefore, the trial court erred in denying defendant's motion to suppress on that basis.

As noted, after the suppression hearing, the trial court held that, in the alternative to stopping defendant based on reasonable suspicion, the officers could have stopped defendant as a material witness under *Fair*. The trial court held that it was "reasonable for the officers to believe that these individuals had some information that would be critical to the police investigation."

Under Article I, section 9, officers can stop and temporarily detain a person for on-the-scene questioning when they "reasonably suspect the person can provide material information about a crime's commission." *Fair*, 353 Or at 608. The stop does not violate Article I, section 9, so long as three conditions are met:

> "(1) the officer reasonably believes that an offense involving danger of forcible injury to a person recently has been committed nearby; (2) the officer reasonably believes that the person has knowledge that may aid the investigation of the suspected crime; and (3) the detention is reasonably necessary to obtain or verify the identity of the person, or to obtain an account of the crime."

*Id*. at 609. "In adopting [these] factors, [the Supreme Court did] not foreclose refinement of them in future cases involving other factual circumstances." *Id*.

In *Fair*, the defendant called 9-1-1, dispatch overheard the defendant saying, "stop it" and "get off me," and it also heard a man yelling in the background before the call was disconnected. *Id*. at 590. When officers arrived at the scene shortly after the call, they immediately observed that the area above the defendant's right eye was swollen, and that the "defendant's husband appeared angry and was uncooperative and evasive." *Id*. at 591, 610. The officers then ordered the defendant and her husband onto the front porch, talked to the defendant about the circumstances of the 9-1-1 call, and eventually discovered that the defendant was in possession of drugs. *Id*. at 591-92. The Supreme Court held that the officers had authority to stop and temporarily detain the defendant as a material witness. *Id*. at 615. It reasoned that the officers had probable cause to believe that the defendant's husband had just assaulted the defendant, and "in ordering [the] defendant to stay on the porch, the officers acted reasonably in temporarily detaining her for purposes of questioning her as a witness to and victim of a recent or ongoing assault." *Id*. The court determined that the officers could stop the defendant, because they had "an objectively reasonable belief that [the] defendant could provide information material to the assault." *Id*.

Here, the stop was not lawful under the material-witness exception, because the officers did not have an "objectively reasonable basis to believe that *defendant* was a material witness to a crime." *State v. Middleton*, 302 Or App 339, 352, 459 P3d 918 (2020) (emphasis in original). In *Fair*, the defendant called 9-1-1 herself, which gave the officers reason to believe that the defendant had witnessed a crime. *Fair*, 353 Or at 599, 611-12 (the defendant calling 9-1-1 was a "tacit invitation for [the police] to come to her aid"). But, here, a motel employee called 9-1-1 to relay a reported dispute secondhand. Defendant was not involved in the report in any way such that the officers had a reason to believe that he had information about the reported dispute.

In addition, the officers' observations in *Fair*, including the defendant's 9-1-1 call, her swollen eye, and her husband's apparent anger and evasiveness, created "an objectively reasonable basis to believe that [the] defendant was a victim of a domestic assault that had just occurred at the home and likely possessed information material to that crime." *Id*. at 611. In this case, the state argues that Merritt had an objectively reasonable basis to believe that defendant had information about the reported dispute because of defendant's proximity to the vending machines, and because Merritt observed that H had been crying and was evasive.

Defendant's proximity to the crime was "not sufficiently specific or individualized to trigger the material-witness exception," especially when the state presented no evidence regarding how long the car may have been parked in that location. *Middleton*, 302 Or App at 352 (holding that the officer did not have an objectively reasonable basis to believe that the defendant was a material witness to a DUII based on the fact that the defendant was driving near the area of a car accident; "[t]he fact that anyone driving in the area might theoretically have been in the area earlier and witnessed the suspected crime is not sufficiently specific or individualized to trigger the material-witness exception"). Unlike the officers' observations of an ongoing assault in *Fair*, the officers here did not arrive in the middle of an exigency or observe any specific crime. H showed no signs of injury, she provided an alternative explanation for her apparent crying, and "uncooperative and evasive behaviors alone do not indicate that a recent or ongoing assault had taken place." *State v. Garcia*, 276 Or App 838, 852-53, 370 P3d 512 (2016) (holding that the *Fair* doctrine did not apply when the witness seemed "kind of frazzled," had been crying, denied that any argument with the defendant had occurred, showed no signs of injury, and did not request assistance). Therefore, we conclude that the material-witness exception does not apply and is insufficient to support an alternative basis for the stop.

In summary, we conclude that the 9-1-1 report was not sufficiently reliable to support reasonable suspicion, because the report was made secondhand, and the officers

did not sufficiently corroborate the report. We also conclude that the material-witness exception did not provide a constitutional basis for the stop. Without reasonable suspicion or the material-witness exception, the officers lacked a constitutional basis to stop defendant. Therefore, the trial court erred in denying defendant's motion to suppress evidence discovered as a result of the stop.

Reversed and remanded.